**UNITED STATES of America,**
**Plaintiff,**

v.

**1. Jose Martin GARCIA–JAQUEZ, a/k/a Humberto Aguirre–Rodriguez a/k/a Che Ramon Miranda, a/k/a Ramon Miranda, a/k/a Jose Aagarcia, Defendant.**

**Criminal Action No. 11–cr–00153–WJM.**

United States District Court,
D. Colorado.

Sept. 7, 2011.

---

Kurt J. Bohn, U.S. Attorney's Office, Denver, CO, for Plaintiff.

Virginia L. Grady, Office of the Federal Public Defender, Denver, CO, for Defendant.

## MEMORANDUM AND ORDER ON SENTENCING

WILLIAM J. MARTÍNEZ, District Judge.

This case came before the Court for sentencing on September 6, 2011. At the sentencing hearing, the Court granted Defendant's Motion for a Non–Guidelines or Variant Sentence and imposed a sentence of 14 months incarceration and one year of supervised release. The purpose of this Memorandum is to elaborate on the bases for the Court's variant sentence.

### I. FACTS AND BACKGROUND

Defendant was born in 1972 to a close-knit family in Gomez Palacio, Mexico. In his teens, he went to live with his grandparents in Juarez, Mexico and his parents moved to the United States in search of better employment. At age 20, Defendant

first entered the United States unlawfully to join his parents.

Defendant has a lengthy criminal history that consists mainly of traffic offenses. In 2008, Defendant pled guilty to First Degree Trespass of a Dwelling, a class 5 felony under Colorado law. Defendant was sentenced to two years in prison followed by two years on parole. On July 31, 2009, Defendant was paroled into custody of the Bureau of Immigration and Customs Enforcement ("BICE") and deported to Mexico.

In November 2010, Defendant returned to the United States to visit his parents. He was arrested following a traffic stop on December 15, 2010. During the interrogation that followed his arrest, Defendant admitted that he had been previously deported and had re-entered the country without inspection. BICE was notified of his unlawful presence and an immigration hold was placed on Defendant. Defendant then served some time in state prison for a parole violation.

On April 18, 2011, the grand jury returned an indictment charging the Defendant with violating 8 U.S.C. § 1326(a) and (b)(2). (ECF No. 1.) On June 17, 2011, the Defendant pleaded guilty to the charge in the Indictment pursuant to a plea agreement.

## II. SENTENCING METHODOLOGY POST-*BOOKER*

■ In determining an appropriate sentence, the Court must first calculate the Defendant's precise guideline range. *Gall v. United States*, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). While the guidelines "should be the starting point and the initial benchmark", they are not the only consideration. *Id.* The Court must not presume the guideline range is reasonable but must make an individual assessment of the § 3553(a) factors based

on all of the facts presented. *Id.* at 51, 128 S.Ct. 586.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are laid out in the second factor. § 3553(a) (2000 ed., Supp. V). It then lists seven factors that a sentencing court must consider. The first factor is a broad command to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The second factor requires the consideration of the general purposes of sentencing, including:

the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a)(2).

The third factor pertains to "the kinds of sentences available," § 3553(a)(3); the fourth to the Sentencing Guidelines; the fifth to any relevant policy statement issued by the Sentencing Commission; the sixth to "the need to avoid unwarranted sentence disparities," § 3553(a)(6); and the seventh to "the need to provide restitution to any victim," § 3553(a)(7).

■ The Court may vary from the Guideline range based on a finding that, as to a particular defendant, any sentence imposed within that range would be greater than necessary to achieve the purposes

of § 3553(a). The Court may also categorically vary from the guidelines based on a policy disagreement with a particular guideline. *Spears v. United States,* 555 U.S. 261, 265, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) ("[D]istrict courts are entitled to vary from the crack-cocaine guidelines in a mine-run case where there are 'no particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range"). The most commonly cited example of this practice is the 100:1 crack-cocaine disparity, *see Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), but district courts have varied based on a policy disagreement in cases involving child pornography and immigration, amongst others. *See United States v. McElheney,* 630 F.Supp.2d 886, 895–96 (E.D.Tenn.2009) (child pornography guidelines not entitled to deference and granting downward variance); *United States v. Meysenburg,* 2009 WL 2948554 (D.Neb. Sept. 11, 2009) (same); *United States v. Pahua–Martinez,* 2009 WL 2003241 (D.Neb.2009) (granting downward variance based on policy disagreement with immigration guidelines).

## III. CALCULATION OF DEFENDANT'S SENTENCE UNDER THE GUIDELINES

After Defendant entered his guilty plea in this case, the Probation Office prepared a Presentence Investigation Report ("PSIR"). (ECF No. 26.) Pursuant to Section 2L1.2(a) of the United States Sentencing Guidelines ("Guidelines"), the base offense level for a violation of 8 U.S.C. § 1326(a) is 8. The PSIR construed Defendant's prior trespass conviction as a crime of violence and applied Section 2L1.2(b)(1)(A)'s 16 level enhancement, which brought Defendant's offense level to 24. The PSIR decreased the offense level by 3 levels to a total offense level of 21, based on Defendant's acceptance of re-

sponsibility. (ECF No. 26); U.S.S.G. § 3E1.1 (a), (b).

Defendant objected to the PSIR's 16 point enhancement arguing that the trespass conviction was not a crime of violence and that he should be subject only to an 8 level enhancement under Section 2L1.2(b)(1)(B). (ECF No. 28.) The Government agreed with Defendant's characterization of the prior conviction and that the 8 level enhancement should apply. (ECF No. 33.) In response, the Probation Office prepared an Amended Presentence Investigation Report ("APSIR") that included the 8 level enhancement, instead of the original 16 level enhancement, resulting in a revised adjusted offense level of 16. (ECF No. 35.) This revised adjusted offense level was then further reduced by 3 levels for Defendant's acceptance of responsibility. *Id.* Neither party objected to the APSIR and the Court relied on it at the September 6, 2011 sentencing.

In accordance with the APSIR, the Court found that Defendant's offense level was 13 and his criminal history category was IV. This resulted in a Guideline range of 24–30 months imprisonment and 2 to 3 years supervised release. At sentencing, the parties agreed that 24–30 months was the Defendant's correct Guideline range.

## IV. BASES FOR VARIANCE RAISED BY DEFENDANT

In his Motion and at sentencing, Defendant argued that the Court should grant a downward variance from the guideline range because the Section 2L1.2—the Guideline driving Defendant's range in this case—is not based on empirical evidence. Defendant also contended that Section 2L1.2(b)(1) unfairly punishes him twice for a single conviction. Defendant additionally asked the Court to reduce his sentence to account for the time he spent in state

custody before the Government brought federal charges.

The Court will address these arguments in the context of § 3553(a) below.

## A. Section 3553(a)(1)—The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

With respect to the nature and circumstances of the offense, there is little worth noting. Defendant is being sentenced here for having violated 8 U.S.C. § 1326(a) and (b)(2) by re-entering the United States after having previously been deported. This is not a violent crime and there is no victim. The manner in which Defendant committed his crime is typical of an unlawful re-entry case. He returned to the United States to visit his family that lives here—including his parents, a brother, and a sister—and was arrested during this visit.

The characteristics of the Defendant are also typical of one convicted of unlawful re-entry. Defendant first entered the United States at age twenty and has lived here the majority of his adult life. Most of Defendant's immediate family resides in the United States, and in Colorado in particular. Defendant has experienced tragedy in that he witnessed his uncle's murder as a young child.

While the Court is sympathetic to Defendant's background and personal and family situation, it is confronted with very similar circumstances in nearly every unlawful re-entry case. Most defendants that appear before the Court for sentencing on an unlawful re-entry charge have family members that reside in the United States. Most defendants have experienced tragedy and personal hardship. To some extent, Mr. Garcia–Jaquez is in a better position to return to Mexico than many defendants in that he has a support system and some family members still residing in Mexico.

The Court does not find that the nature and circumstances of the offense or the personal characteristics of the Defendant warrant a variance in this case.

## B. Section 3553(a)(2)—Purpose of Sentencing

■ The preface of Section 3553 directs the Court to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing. The purposes of sentencing are set forth in § 3553(a)(2), which direct the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A few points raised in Defendant's Motion for Non–Guideline Sentence and the Government's Opposition to such Motion are worth noting in this context.

### 1. *Need to protect the public from Defendant*

The Government argued that the Court should not vary from the Guidelines because there is a need to protect the public from the Defendant. The Government pointed to the Defendant's "lengthy criminal history" and emphasized that this arrest was the Defendant's 17th interaction with the criminal justice system. The Court has reviewed Defendant's criminal history and believes there is no reason here to be unduly concerned with a need to protect the public. The vast majority of

Defendant's criminal offenses are traffic offenses. The few that are more serious involved the same individual, Defendant's ex-wife, with whom he has not had any contact for nearly five years. Nothing in Defendant's record shows that he is a threat to the public in general and the Court is of the view that a below-Guidelines sentence would not unnecessarily expose the public to harm.

### 2. *Just punishment for the offense*

In his Motion, Defendant argued that a "just" sentence would take into account the fact that the Government waited to seek these federal charges until after he had finished serving his state sentence. Defendant contended that this delay deprived him of the ability to serve his federal sentence concurrent with his state sentence or otherwise seek a coordinated resolution of the two.

Several circuits have recognized that a district court has the authority to issue a below-Guidelines sentence based on the delay between the time federal immigration officials discovered that a defendant unlawfully re-entered the United States and the time that the government charged him with unlawful re-entry. *See, e.g., United States v. Barrera–Saucedo,* 385 F.3d 533, 537 (5th Cir.2004) (holding that it was "permissible for a sentencing court to grant a downward departure to an illegal alien for all or part of time served in state custody from the time immigration authorities locate the defendant until he is taken into federal custody."); *United States v. Sanchez–Rodriguez,* 161 F.3d 556, 562 (9th Cir.1998) *(en banc)* (holding that a downward departure may be granted based on a defendant's lost opportunity to serve his federal sentence concurrently with his state sentence due to the delay in commencing federal proceedings after immigration authorities discovered him in state

custody); *see also United States v. Saldana,* 109 F.3d 100, 104 (1st Cir.1997) (noting that it was "possible" that a departure might be granted "where a careless or even an innocent delay produced sentencing consequences so unusual and unfair that a departure" would be warranted).

Though the Tenth Circuit has not addressed this issue, at least one court in the circuit has granted a variance based on the Government's delay in bringing unlawful reentry charges. In *United States v. Garcia–Ruiz,* 2009 WL 3319789 (D.N.M. Aug. 21, 2009), the Government placed an ICE detainer on Garcia–Ruiz eighteen months before it took him into federal custody on unlawful re-entry charges. The Court found "that it is appropriate to vary from the guidelines here to avoid imposing an unnecessarily harsh sentence and to avoid creating unwarranted sentencing disparities because of the unusually long delay between the time the detainer was lodged and the time he entered federal custody. See 18 U.S.C. § 3553(a) and 3553(a)(6)." *Id.* at *2.

In this case, Defendant was contacted by immigration officials and had an immigration detainer placed on him on December 15, 2010, the day he was arrested. The Government did not seek to obtain the instant Indictment until April 19, 2011, by which time Mr. Garcia–Jaquez had already finished serving his state sentence. The Government's Opposition to the Motion for a Non–Guideline Sentence does not at all address this issue. The Government has provided no explanation for its delay in bringing the federal indictment against this defendant.

The Court finds that Defendant has shown that he was prejudiced by the Government's delay in bringing the federal charge against him. While a four-month delay is not extreme, in the absence of a showing to the contrary by the Govern-

ment, the Court finds that in this case such a delay was unreasonable. Immigration authorities were aware of the Defendant's presence in the United States as of December 15, 2010. While some brief period of time is needed to check Defendant's immigration status or otherwise investigate the case, it certainly should not take four months. *See, e.g., United States v. Santos,* 406 F.Supp.2d 320, 329 (S.D.N.Y. 2005) (finding five-month delay unreasonable and granting variance on this basis).

Accordingly, the Court finds that a variance is appropriate based on the four-month delay in bringing federal charges.

## C. Section 3553(a)(3)—Kinds of Sentences Available

With respect to § 3553(a)(3), which directs the Court to consider the kinds of sentences available, there is no dispute here that only one kind of sentence is available to Defendant—a period of incarceration most likely followed by deportation. Therefore, this section does not warrant any additional discussion.

## D. Section 3553(a)(4) and (5)—Guideline Range and Sentencing Commission's Policy Statements

Sections 3553(a)(4) and (5) direct the Court, in fashioning a statutory sentence, to consider the sentencing range established by the Sentencing Guidelines as well as any pertinent Policy Statements issued by the Sentencing Commission. As previously noted, in every sentencing, the Court must begin by properly and precisely calculating the applicable Guideline range. The Court did so in this case and found that Defendant's guideline range was 24–30 months.

The relevant Sentencing Guideline in this case is Section 2L1.2. Defendant's Motion for a Variant Sentence raises two arguments about the validity of Section 2L1.2 and the degree of deference the Court should afford to that guideline. The Court will examine each of these arguments in turn below.

### 1. *Lack of empirical evidence supporting 2L1.2(b)(1)*

Defendant argues that the Court should vary from the guideline range because Section 2L1.2(b)(1) is not based on empirical evidence.

In 1984, Congress established the Sentencing Commission ("Commission") to formulate and constantly refine national sentencing standards that furthered the basic principles of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation. U.S.S.G. § 1A1.1; 28 U.S.C. § 994(a); *Rita v. United States,* 551 U.S. 338, 347–350, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). In drafting the initial version of the Guidelines, the Commission could not agree on which of these principles of punishment should be emphasized. Accordingly, the Commission took "an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice." U.S.S.C. § 1A1.3. The Commission's analysis of the empirical data helped it identify a list of relevant distinctions that were important to sentencing courts. These distinctions formed the basis for the enhancements and reductions that affect a defendant's offense level in the Guidelines. *Id.* Ultimately, the Guidelines "represent an approach that begins with, and builds upon, empirical data." *Id.*

The Commission fills an important institutional role; it has the capacity courts lack to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir.2007) (McConnell, J.,

concurring). As the Supreme Court has noted, the Guidelines are ever-evolving:

> The Commission's work is ongoing. The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process. The sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since *Booker*, by imposing a non-Guidelines sentence). The judges will set forth their reasons. The Courts of Appeals will determine the reasonableness of the resulting sentence. The Commission will collect and examine the results. In doing so, it may obtain advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others. And it can revise the Guidelines accordingly.

*Rita*, 551 U.S. at 351, 127 S.Ct. 2456. The Commission is to periodically revise the Guidelines "in consideration of the comments it receives from members of the federal criminal justice system, including the courts, probation officers, the Department of Justice, the Bureau of Prisons, defense attorneys and the federal public defenders, and in consideration of the data it receives from sentencing courts and other sources." U.S.S.G. § 1A2.1; 28 U.S.C. § 944(o).

A sentencing court is permitted (but not required) to look behind the Guidelines as part of the calculation as to how much deference a particular Guideline should be given. *United States v. Alvarez–Bernabe*, 626 F.3d 1161, 1166 (10th Cir.2010). The fact that the Commission did not provide a basis for a certain enhancement does not make that Guideline invalid *per se*. *Id.* However, the Court is free to examine whether the lack of a basis for an enhancement should affect the weight the Guideline is given. *United States v. Aguilar-*

*Huerta*, 576 F.3d 365, 367–68 (7th Cir. 2009).

"The extent to which a sentencing court should accord respect to a guideline will generally depend on whether, when it developed the guideline, the Commission functioned as Congress envisioned in the Sentencing Reform Act." Lynn Adelman & Jon Deitrich, *Improving the Guidelines Through Critical Evaluation: An Important New Role for District Courts*, 57 Drake L.Rev. 575 (2009). When Guidelines are not the result of "the Commission's exercise of its characteristic institutional role," such as when they are not based on any identified empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 109, 128 S.Ct. 558 (quoting *Rita*, 551 U.S. at 350, 127 S.Ct. 2456); *see also Gall*, 552 U.S. at 46 n. 2, 128 S.Ct. 586 (noting that not all Guidelines are tied to empirical evidence). District Judge Lynn Adelman has written as follows:

> For district courts that accept the Supreme Court's invitation to critique the Guidelines, the question of whether a particular guideline warrants respect will depend largely on how and why it was created. The Commission that created the original Guidelines could not agree on which of the purposes of sentencing deserved priority; thus, it reportedly based some guidelines on past practice, *i.e.*, preguideline sentences. To the extent that it can be established that a guideline is based on past practice, the guideline may be regarded as reflecting the purposes of sentencing and, therefore, worthy of respect. A

guideline that is based on Commission research and expertise may also be regarded as properly advancing the purposes of sentencing.

The problem is that few guidelines can be shown to be based on actual pre-guideline sentencing practice or on Commission research and expertise. This is so for many reasons. First, when the Commission drafted the original Guidelines it had limited data concerning past practice, and the data it did have was sketchy. Second, in determining pre-guideline sentencing practice, the Commission arbitrarily excluded sentences of probation. This decision significantly skewed the data relating to past practice because approximately 50% of defendants in the preguideline era received sentences of probation. Third, the Commission, without serious explanation, increased the severity of sentences for a number of offenses. Fourth, since enacting the original Guidelines, the·Commission has amended many of them, making them even more severe. As one commentator put it, the result has been a "one-way upward ratchet increasingly divorced from considerations of sound public policy and even from the commonsense judgments of frontline sentencing professionals who apply the rules." Many of the Commission's amendments increasing the severity of sentences came in response to Congress's actions—either its establishment of mandatory minimums or its directives to the Commission. Such amendments obviously are not based on Commission research and expertise.

Adelman & Deitrich, *supra* at 578–79. Where Guidelines are not based on empirical evidence or on the Commission's research and expertise, the Guideline ranges for those crimes are a less reliable appraisal of a fair sentence. *See Kimbrough*, 552 U.S. at 109–10, 128 S.Ct. 558. In such cases, it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Kimbrough*, 552 U.S. at 110, 128 S.Ct. 558.

The enhancements in § 2L1.2(b)(1) lack the backing of empirical data. Judge Adelman has compiled a brief history of this Guideline:

> Based on its analysis of past sentencing practices, the Commission originally set the offense level in [unlawful reentry] cases at six. In 1988, it increased the offense level to eight, and in 1989 it created a four-level enhancement for defendants previously convicted of certain felonies. In 1991, the Commission adopted a sixteen-level enhancement for those previously convicted of aggravated felonies. To put this action into perspective, a fraud defendant at the time needed to cause a loss of $20,000,000 to $40,000,000 to face such an enhancement. The Commission's justification for the enhancement is strikingly insubstantial:

> This amendment adds a specific offense characteristic providing an increase of 16 levels above the base offense level under § 2L1.2 for defendants who reenter the United States after having been deported subsequent to conviction for an aggravated felony. Previously, such cases were addressed by a recommendation for consideration of an upward departure.... The Commission has determined that these increased offense levels are appropriate to reflect the serious nature of these offenses.

> As two commentators explained:

> The Commission did no study to determine if such sentences were necessary—or desirable from any penal theory. In-

deed, no research supports such a drastic upheaval. No Commission studies recommended such a high level, nor did any other known grounds warrant it. Commissioner Michael Gelacak suggested the 16–level increase and the Commission passed it with relatively little discussion. The 16–level increase, therefore, is a guideline anomaly—an anomaly with dire consequences.

Subsequently, the Commission attempted to diminish "some of the harshness of [this guideline] by providing gradations of enhancements, from 8 to 16 levels depending on the perceived seriousness of the prior felony." Today, the sixteen-level enhancement is reserved for drug-trafficking offenses for which the sentence imposed exceeded thirteen months, crimes of violence, firearms offenses, child-pornography offenses, national-security or terrorism offenses, human-trafficking offenses, or alien-smuggling offenses. Nevertheless, application of the guideline remains problematic for many defendants. First, by placing such heavy emphasis on the defendant's prior record—which is also accounted for in the defendant's criminal history category—the guideline effectively punishes the defendant twice for the same misconduct. The Commission has never explained what penological goals are furthered by such double counting. Second, a sixteen-level enhancement—which increases the sentence by anywhere from five to fourteen

times—seems far out of proportion to any reasonable assessment of dangerousness.

*Id.* at 588–89. The changes to the Guidelines that added the enhancements based on an offender's prior convictions resulted in a nearly three-fold increase in the amount of time served in prison for immigration offenses between 1990 and 2001. UNITED STATES SENTENCING COMMISSION, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM (2004).

Though it has not been addressed by the Tenth Circuit[1], a number of courts have recognized that a sentencing court is free to give less deference to § 2L1.2 because it is not based on empirical evidence. *See, e.g., United States v. Bonilla,* 618 F.3d 102, 110 (2d Cir.2010) (remanding because district court failed to consider whether variant sentence was appropriate based on the lack of empirical data underlying § 2L1.2); *United States v. Aguilar–Huerta,* 576 F.3d 365, 367–68 (7th Cir.2009) (discussing § 2L1.2 and noting "rejecting a guideline as lacking a basis in data, experience, or expertise would ... be proper."). As one court has held "since the immigration-crimes Guidelines are driven by Congressional directive, rather than empirically grounded, the Sentencing Commission was not operating within its characteristic institutional role in drafting the Guidelines and the advice imparted in those Guide-

---

1. At sentencing, the Government argued that the Tenth Circuit has repeatedly rejected the Defendant's argument regarding § 2L1.2's lack of empirical evidence and cited *United States v. Irazoqui–Leyva,* 399 Fed.Appx. 337 (10th Cir.2010) in support. However, in *Irazoqui–Leyva,* the Tenth Circuit held that it was not erroneous for a district court to decline to analyze whether a Guideline is empirically-based as part of its sentencing determination. *Id.* at 339–40. The Tenth Circuit noted that

the district court "would have had substantial leeway to accept Ms. Irazoqui–Leyva's argument that the [prior conviction enhancement] is excessive", it was "not required to" do so. *Id.* at 340. The Government's contention on this point is thus singularly unavailing, as nothing in the *Irazoqui–Leyva* opinion (or any others that the Court could locate) *precludes* the Court from looking behind a Guideline at its history in determining whether the Guideline range should be afforded deference.

lines can be afforded less deference by the court." *United States v. Pahua–Martinez,* 2009 WL 2003241 (D.Neb.2009).

In this case, Defendant's guideline range is primarily driven by § 2L1.2(b)(1), which is not based on empirical data, and the Court found that strict application of this Guideline yielded a sentence greater than necessary to achieve § 3553(a)'s purposes. Accordingly, the Court granted a variant sentence based in part on this finding.

2. *Double-counting of Defendant's prior conviction*

Defendant also argues that Section 2L1.2(b)(1)'s enhancement based on his prior conviction unfairly penalizes him twice for the same offense. Garcia–Jaquez was convicted in 2008 of 1st Degree Trespass of a Dwelling, a class 5 felony under Colorado law. As noted in his APSIR, this conviction increases his offense level by 8 to a total of 13. It also counts as 3 criminal history points towards his total of 7, which results in a criminal history category of IV. In his Motion, Defendant argued that the double-counting of this single conviction results in a "substantial overstatement of the seriousness of the instant offense." (ECF No. 30 at 7).

Application Note 6 to § 2L1.2 provides: "A conviction taken into account under subsection (b)(1) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History)." Thus, the Guidelines explicitly state that any prior conviction of a defendant being sentenced for unlawful re-entry should count both as an enhancement of his offense level and for however many points are assigned to that conviction for purposes of calculating criminal history. Every court to address this issue has held that this double-counting of a prior conviction does not make § 2L1.2 invalid *per se.*

See, e.g., *United States v. Hernandez–Fierros,* 453 F.3d 309, 312 (6th Cir.2006). However, a sentencing court is permitted to consider whether the double-counting of a prior conviction causes the recommended sentence to be greater than necessary to achieve the purposes of sentencing. *See United States v. Galvez–Barrios,* 355 F.Supp.2d 958, 963 (E.D.Wis.2005) ("Although it is sound policy to increase a defendant's sentence based on his prior record, it is questionable whether a sentence should be increased twice on that basis."); *United States v. Santos,* 406 F.Supp.2d 320, 327 (S.D.N.Y.2005). As one court has observed: "Nowhere but in the illegal re-entry Guidelines is a defendant's offense level increased threefold based solely on a prior conviction." *United States v. Santos–Nuez,* No. 05–1232, 2006 WL 1409106, *6 (S.D.N.Y. May 22, 2006).

The Court has significant concerns about Section 2L1.2(b)(1)'s use of a prior conviction to enhance the offense level. In the vast majority of categories of crimes, the offense level is adjusted based on the characteristics of the offense on which the defendant is being sentenced. For example, the offense level for a defendant convicted of robbery is driven by whether a firearm was used in the robbery, the amount of loss suffered, and whether any harm came to the victims of robbery.

This case is about Defendant having unlawfully re-entered the United States after he was previously deported. To re-enter after having been deported is a crime regardless of whether Defendant had a prior conviction and regardless of the nature of that prior conviction. Quite simply, the crime is re-entering the country after having been deported, regardless of past criminal history.

The Court understands that the public has a greater interest in keeping convicted

felons from re-entering the country in that felons are more likely to commit additional crimes and, therefore, as a general proposition, pose a greater threat to the public. *See, e.g., United States v. Zapata*, 1 F.3d 46, 49 (1st Cir.1993) (Commission reasonably determined that a felon re-entering the United States after having been deported was a more serious offense than a non-felon doing the same). Thus, the Court does not find that it is wholly unwarranted to consider the Defendant's prior convictions in determining a fair sentence.

However, the Court has already considered Defendant's prior convictions in determining his criminal history category. *See* U.S.S.G. § 4A1.1 (describing how to calculate criminal history points). Unlawful re-entry cases are one of the few categories of cases in which a prior conviction has the double impact of increasing both the offense level and the criminal history category. While the Court acknowledges the need to consider a defendant's prior criminal history in sentencing, the fact that a prior conviction can, in some unlawful re-entry cases, more than triple a guideline sentence places excessive and unwarranted emphasis on the defendant's prior acts instead of placing the focus where it should be—on the instant offense.

In this case, the Court found that the double-counting of Defendant's trespass conviction resulted in a guideline range greater than necessary to achieve the goals of § 3553(a). However, the Court did not simply eliminate the trespass conviction from either the offense level or the criminal history category. Instead, the double-counting was a factor that the Court considered in its overall determination of a sentence that was sufficient but not greater than necessary to achieve the purposes of sentencing.

### E. Section 3553(a)(6)—Avoiding Unwarranted Sentencing Disparities

Pursuant to Section 3553(a)(6), the Court was to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. The Government argued that a variant sentence would decrease uniformity both nationally and within the judicial district. The Court has reviewed the statistics on sentencing in immigration cases and is not concerned that a below-guidelines sentence will result in an *unwarranted* disparity. Statistics from the Sentencing Commission show that, in 2010, nearly forty percent of immigration cases nationwide and thirty-five percent of cases in the Tenth Circuit had some kind of downward departure or variance from the guideline range. UNITED STATES SENTENCING COMMISSION, *STATISTICAL INFORMATION PACKET—TENTH CIRCUIT* at 18–19 (2010). Thus, there is already substantial disparity in sentencing in unlawful re-entry. Moreover, the Court finds that a below-guidelines sentence is warranted based on the all of the facts and circumstances of this case.

### F. Section 3553(a)(7)—Need for Restitution

With respect to Section 3553(a)(7), restitution is not an issue as there are no victims.

### V. CONCLUSION

As previously noted, Defendant's offense level was 13 and his criminal history category was IV which resulted in a Guideline incarceration range of 24–30 months. At his sentencing hearing, the Court granted Defendant a six-month downward variance from the bottom of this Guideline range in order to properly account for the double-counting of his prior conviction, as well as the lack of empirical data supporting the

eight level enhancement in § 2L1.2(b)(1). The Court also granted Defendant an additional downward variance of four months based on the Government's delay in bringing federal charges.

After considering all of the factors outlined in § 3553(a), the Court found that a sentence of fourteen months imprisonment followed by a term of supervised release of one year was sufficient but not greater than necessary to achieve the purposes of sentencing. The Defendant was remanded to the custody of the Bureau of Prisons to serve this sentence.